The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning and please be seated. Okay, we'll begin with Lewis v. Circle K and Mr. Lee. Come right on up. My piece of court. Good morning, my name is Brian Lee. I represent Jonathan Lewis here on appeal. This appeal is from a summary judgment that was entered by the District Court in this case and we believe that the summary judgment was entered erroneously for different reasons as well as we have brought other parts of the District Court's rulings to other ones as well in this appeal for the Court's consideration. The summary judgment we believe was erroneously entered because the District Court committed an error in finding that Circle K, the condition in front of the Circle K was an open and obvious hazard. We've briefed and we've shown that Circle K had the duty to warn invitees such as Mr. Lewis of dangerous conditions that it created and it is undisputed in this case that they created the condition that Mr. Lewis slipped on. And so because of that and because that this was completed at the entrance of the store where customers such as Mr. Lewis would be going back and forth doing their normal business at the Circle K, we also believe that it was not open and obvious. How busy was the traffic in front of the store? Do you have any evidence of that? I know they say that there were seven people that came, but in terms of what the company could anticipate, what was the traffic at the store at this particular point? Sure, Your Honor. I believe from the video itself the time between when Mr. Lewis, I think, was just getting there into the parking lot as well as when he's going into the store and then coming back during this time of cleaning, I believe there was at least six people, could be seven depending upon the angles you're looking at, that would have been in and out of the store during this time. Does that make a difference legally? I don't believe so, Your Honor. And the reason is because... Even if it doesn't make a difference, whether there's maybe he's the only person going in as opposed to whether there's a good deal of foot traffic, you don't think that makes a difference? Well, I do caveat that, Judge. I do believe it does make a difference in the sense of this was an area of the store, obviously the entrance of the store that Circle K knew customers would be frequently coming in and out. So this is not a situation where this is a parking lot that's off-site and there wouldn't be any really recognition of foot traffic that would be there. But it might make a difference in terms of what the store could anticipate by way of a distraction or what have you. Sure, Judge. I do see what you're saying. Obviously, if there's a lot of people coming in and out of the store and they're sort of a bustle, then you certainly... I think that would in order to benefit, frankly. If somebody's coming out of the store with a bag or somebody's coming out of the store with a baby in a carriage or in a thing or somebody's going in behind you or whatever, that could make a difference, could it not, in terms of the sort of distraction that the store could anticipate? Sure. Yes, sure. And it certainly would. That is a reasonable thing that a store has to guard against because not everyone's going to be, I think as you're going, Your Honor, not everyone's going to be looking at the ground, watching as they go into a store. So not everybody's going to be the lone customer. Very true, Judge. I do think that although that is certainly a flavor of the facts of a case where it could make it even more unlikely that someone may have seen what was going on, I think at the end of the day the fact is that the condition itself, irregardless of who would have been and how many people would have been coming in at one moment, the condition itself was not an open anonymous condition. The condition was not just that the concrete was wet, which could happen because of rain or a lot of different things. The condition that we're talking about in this case, what made a dangerous condition, is the fact that there was the employee put the water but also this chemical element, the CAF element that we're talking about. What is the evidence in the record that the CAF increases the slipperiness rather than decreases the slipperiness? Yes, Your Honor. So Dr. Durek, who's our expert, he said, and this is at the Joint Appendix 346, he says that the CAF material is not meant to be used in a situation where there's a paint stripe or something that has basically taken up the pores of the concrete. It's used to pick up oil stains and things of that sort because what it does is it basically kind of eats it. What he says, it eats the hydrocarbons for a technical term. But what he does say is that in this particular case that the CAF material would have laid on top of the painted stripe because it could not go down to the pores of the concrete. And so what we have in this case is we've got not only... Okay, but I got all that.  But why do I think that makes it more rather than less slippery, right? I mean, sand also would lay on top, but sometimes sand like increases grit, sometimes it decreases it.  Based on the record, what am I looking at to understand that the CAF made it more slippery than just water? Because Dr. Durek in his testimony says that it laid on top of it and therefore it was present on it. But does he then say, and that makes it more slippery? That's the part I'm missing, right? I get the factual foundation, but what I don't naturally see is him saying CAF on paint is more slippery than water on paint. Sure, and I think that part of the reason why he is not able to go all the way there, Your Honor, is because he was not able to determine the slipperiness of the paint. Because he does say that there are two elements of this. There's a paint that's underneath, and the paint could be just a flat paint. It could be something that has degraded over time, and therefore some of the concrete started to make it more rough. And then you put an element on top of it. Now, he does say that that element was on top of it, but he was not able to determine the paint, and I guess you can call it the slipperiness of the paint that's under it as well, because that was spoliated. That's another part of our case. It seems to me that my colleague raises a good question. And the question is what was the substance, and did the substance, whatever it might be, make the condition more or less, made the situation more or less dangerous? Is that a matter for the jury, the question of whether or not the substance, as it was employed, increased the danger or not? Is that part of what the jury would want to determine? I do think that the jury would determine that, because it's something where the expert would talk about, because we know that the substance was there. We know the material was there. We know that Mr. Lewis slipped on the material. There's multiple pieces of evidence that he slipped, and that there was what Dr. Durek talks about, a 10 to 12 inches across the painted line, which showed the material, meaning that we know he slipped on that material that was there, that was laid on top. We know that that material was put on that painted stripe by the defendant, by Circle K's employee. And so when we get to the point of whether it was negligent to do that, the way that they were trying to, whatever they were doing with those materials. Because all I'm saying is the exact, is the question of the exact properties of the material, and the enhanced or diminished degree of danger. Is that one of those things that's sufficiently in dispute that you'd want the jury to take a look at it? I do believe, I don't believe that the properties of the CAF material are in dispute. Everybody knows what it was. Dr. Durek talks about it. Mr. Wiggins doesn't really dispute it, what the properties are. Whether that was a dangerous condition, meaning whether it was something that caused the slip, should not have been put on there, should have been put on there, those are the issues that I think the jury is going to have to determine. Can you help me? I just want to make sure I understand the precise grounds of the district court's decision. Now, I know the district court rejected some dabbler arguments that you made, but I'm talking about the district court's decision to enter summary judgment against you. Yes, Your Honor. One, the district court said that the dangerous condition was open and obvious. That's right. And in the alternative, the district court said you couldn't establish causation without expert testimony. Correct. And I would add, Your Honor, that not only did it say that it wasn't an open and obvious condition, but the court also found that Circle K would not have anticipated the harm that it would cause to Mr. Lewis. I didn't want to— No, I understand. Thank you. No, I appreciate the clarification. I will just say I'm deeply confused by the district court's causation holding. The causation is that we can't prove that it was the slip and fall that ruptured the patella without expert testimony. That's what I read the district court as saying? That's what I read it as well. And you understand that it's going to the causation of the injury, as in the ruptured patella, not the causation of causing him to fall down? Correct. Okay. Yes. And the—as to the causation that you're talking about, Your Honor, what the district court found was that the—well, take it away from me, family. We've already talked about that. The evidence was, I think, really undisputed that Mr. Lewis said that he slipped. He said after he slipped, he tried to, I think, kind of plant on the ball of his foot to not fall down. And at the point where he does that, he feels like—I think he said he hears a pop. And Dr. Evans, the medical expert, says that his patellar tendon rupture was an acute event, that the hearing a pop after that sort of acute event is normal. And so when we're talking about the causation of the event, that is something that was not only from the evidence, from the lay testimony, not just from Mr. Lewis, but also from the expert testimony. This was an acute event, not some chronic event. I see that I'm in my time, Your Honor, so I will— Yellow light means you've got two minutes of your time. Oh, two minutes of my original— Yeah. We'll give you a red light when you're time to sit down. Gotcha. Okay. I'm always— You can always choose to sit down. We don't ever complain when people do, but— I don't, Judge. Right, so I hope I answered that correctly. I'll reserve the rest of my time for rebuttal. Thank you. Thank you. All right. Let's hear from you, Mr. Holt. Thank you, Your Honor. May it please the Court. Ryan Holt on behalf of the appellees, Circle K. We ask the Court to affirm the district court's grant of summary judgment. In doing so, the Court need not address the other questions of spoliation and expert exclusion. Should the Court do so, we ask the Court to affirm the district court in those regards as well. With respect to summary judgment— Wait, hold on. Hold on. I don't think we can affirm without addressing spoliation, right? Because they claim they should get spoliation sanctions, and they didn't get spoliation sanctions, but maybe if they'd gotten spoliation sanctions, they wouldn't have lost summary judgment. I don't know how we can avoid the spoliation question. I think on the issue of medical causation, it certainly could be done. The issue of that essential element could be dealt with because that does not implicate the idea of the slipperiness. With the open and obvious— Wait, whoa, whoa. The spoliation doesn't implicate the—sorry, what doesn't implicate the slipperiness? So with respect to the medical causation basis for summary judgment, I don't believe that that would—it would implicate the question of whether the condition of the pavement was such that it would have caused it in terms of duty and breach. I think the medical causation piece can still survive that. With respect to the open and obvious, of course, the basis of open and obvious is that there is a dangerous condition. It was simply that it was open and obvious. How in the world is that true? Okay. I mean, as a common social experience, I frequently walk on sidewalks that are obviously wet because it's recently rained or because something's dripped on them. It never once occurs to me, and I don't think it occurs to any reasonable person, just because the pavement has a little water on it, that it's dangerous. In fact, sidewalks are designed not to be dangerous just because there's a little water on them. And so how is it open and obvious that it's been treated with a chemical that, according to the plaintiff, makes it way more slippery than normal, slightly wet pavement? It just feels like the district court got this completely wrong to me. I think it's helpful that it was not a rainy day. So, first off, we're seeing liquid. Fine, then they hosed it down with some water. There's lots of ways that pavement gets wet that doesn't make it dangerously slippery. Well, and I would certainly agree with that, Your Honor, but also with respect to the employee being there with a mop, being in that area. Yeah, someone spilled a Diet Coke or something. I think what's important is the Meadows case indicates that there has to be a reasonable inspection of some kind by the individual who's claiming that it was not open and obvious. Do you think that a plaintiff or anybody walking in and out could see the CAF? They can see it's wet. I got that. But do you really think that the CAF was open and obvious? Is that the argument that you're making, that a reasonable person walking in that store would be like, looks like a little bit of tiny grit on top of the paint, and that's probably an industrial cleaner that makes it slippery? Is that what was open and obvious? No, Your Honor, not the substance itself, but the fact that somebody was putting something other than just water onto the surface. This is somebody who should have put a sign there saying don't walk here and didn't? Can I just go back real quick? Yes, of course. You said other than water? Why was the person walking in supposed to know it was something other than water? I mean, I've cleaned my driveway before. I've never done it with anything other than water. Admittedly, I don't run a gas station. But why would a person look at somebody that's cleaning the pavement and think immediately, oh, I'll bet they're putting some chemicals out here? I think what's helpful in this case is the individual with the mop who is in the process of doing some type of extra cleaning effort with that mop as opposed to just using a hose. And what the plaintiff indicated is that he could see that everything was very visible to him. He just was not paying attention to it. But again, am I right that this person was supposed to have put up a sign saying no one do that? Like how when, say, someone's cleaning a slippery floor, they put up a sign that says this is slippery, don't, you know, be careful? My understanding is the sign would just indicate that it was wet, that there was something going on there.  And that sign indicates this isn't just normal wet. This is dangerously slippery wet, and maybe you should stay away from this. Like that sort of sign, that is what is designed to tell people that? It could help, but this individual also knew and admitted that it was readily apparent what was there. So it would be essentially warning you. But you're committing the same mistake the district court did, readily apparent that it was wet. Yes, not readily apparent that it's way more slippery than a wet surface normally is. And that's where we just turn back to the individual and what he had on his person and what he was in the act of doing. And that it wasn't simply hosing something down or rain. So can I take you to Meadows? It is honestly confusing to me why you think that Meadows is good for you, because Meadows seems terrible to you for me. Because Meadows is a case in which the court said the plaintiff could have taken other non-obviously hazardous routes, one of which was a sidewalk. How is it good for you to rely on a case that the court says even when it's raining, you can probably assume that it's not dangerous, obviously, to take a sidewalk? I think in this case there were those readily available routes that could be taken. And so that's why we rely on Meadows is because – But Meadows is literally a case that says it seems to me it's not obviously dangerous to take a sidewalk when it's wet. Meadows seems to suggest that the wetness is something that ought to be avoided. No, no. No, Meadows says don't go through like the median or something. You should do a reasonable thing like take the sidewalk when it's raining. Right, as opposed to the wet grass, which ended up having a kind of a concealed – more concealed condition. Sort of like having a chemical that you don't know is there. But for the fact that the individual who is applying it has the tools and what have you to indicate something else is going on. You know, these – it seemed that you would have to do so little to make the danger open and obvious. All you'd have to do is put some sort of signage up that said dangerous or slippery or whatever. But there was no signage here and there were no cones here and all the rest. And just a few simple steps would have made the danger open and obvious. But without those steps, it's – as Judge Hyten said, the fact that it is wet doesn't make it dangerous or slippery. And you need a signage. You need some signage or cones to convey that message, don't you? That certainly would add to it. But again, we turn to the fact that the individual who's there and who's doing something is also indicative that there is something other than just wetness going on here at this point. Of course, another basis for summary judgment is the medical causation testimony. So can I take you to that, which I also find deeply perplexing? I don't understand why all of your arguments don't go to damages rather than causation. So if I understand the argument is he can't show that the reason the patella ruptured without medical evidence, that the reason the patella ruptured was because of the slippery surface rather than some defect in his – but I'm looking at his complaint. It does not say I am seeking damages only for a ruptured patella. It says I slipped and I sustained some injuries. And so this all seems like it goes to damages, not causation. Even assuming everything you say is right, I don't understand why this is causation. Except for the fact that the injury Your Honor alludes to is the patella tendon rupture. I'm looking at his complaint. That is not the only injury alluded to in his complaint. I mean if you slip and fall, you could get bruises. You could get cuts. You could get pain. It's not the only – I mean I don't mean to minimize in any way the significance of rupturing one's patella. But that's not the only injury one can get when one falls down as a result of a negligent surface. That seems to be the one in discovery that he indicated is the center of his damages. It doesn't matter if it's the center of his damages. For causation purposes, it would have to be that he has suffered no legally cognizable harm whatsoever unless he can show this. And I don't know how you can establish that. He does not state that legally cognizable harm separate from the patella rupture. And the patella rupture, the question is, does it happen as a result of a slip or as a result of some other mechanism? And all the expert testimony in this case is aligned to what we submit as the one reasonable inference, that it had to be either a foot plant or a toe catch, which would be due, of course, to Mr. Lewis, as opposed to some negligence on behalf of the location. OK, so even on its own terms, that doesn't seem to make sense to me because the plaintiff here testified that he slipped and therefore attempted to use his toe to catch the fall and then heard a pop. So his testimony, which we have to accept, is that in the process of slipping, he didn't slip like in a cartoon where your foot goes out from under you and you fall on your back. It turns out it wasn't a cartoon slip, but instead he slipped and, as lots of us have done, then tried to catch himself. He says under oath that in doing so, he tried to use his toe to do so. And when his toe hit the ground, he heard a pop. It seems like to me the evidence is actually exactly what you've just said is at issue. Like, it could have happened by virtue of his toe and knee moving in different directions effectively, right? That's what he alleged happens. Like, I don't know what I'm supposed to do. Your argument seems to be that the plaintiff's theory is how a tendon would rupture. And apart from Judge Hyten's point, like, I don't understand how your point doesn't simply actually support causation given his testimony. There is expert testimony that suggests that a spontaneous rupture is very much something that occurred. No, no, no, no. There is testimony. It's a summary judgment. You can argue this to a jury. But there's testimony that it was not a spontaneous rupture. We have such testimony, which means contrary testimony simply doesn't matter. We throw it away for summary judgment. You might be able to convince a jury of this. You probably won't. But you might be able to, right, that it just, like, spontaneous combustion happened and it just blew up. But that's a theory at best you get to make to a jury. We have testimony that it was an acute injury, not a spontaneous rupture. And then we have testimony of how he says he slipped and hit his toe and fell. Like, I don't even understand your argument here with respect to the causation. Your Honor, the importance of that contrary testimony is not simply to argue, as we have, that there be one reasonable inference. It is because it raises the specter now of multiple explanations for what happened. And once that happens— Right, but there's testimony that that is, A, there's testimony that that's not what happened, and, B, we're on summary judgment. And there is no reasonable degree of certainty medical testimony that has been given by the plaintiff. They did not hire an expert. To do what? What is it that you think they needed to say? Like, what are the magic words? You say spontaneous rupture. All right. Assume for a minute, at least for present purposes, that that argument woefully fails because there is evidence in the record that that is not the manner in which it occurred. All right, so we take that off the table. There is some evidence that, like, it happens when your toe and your knee go in tension, right, which is what the plaintiff testified to. What do you—what more do you think the expert needed to say? Like, what are the magic words? The plaintiff needed to put forth expert testimony either from a retained expert, which they did not provide, or a treating physician that, to a reasonable degree of medical certainty, more likely than not— in order to prevail. I mean, he doesn't have to put on expert testimony. He has the option of putting on the expert testimony, but it's up to the—you know, whether it's helpful or not. I mean, the district court will obviously have a discretionary call as to whether to permit the expert testimony under Daubert. But the main thing is that the plaintiff is not obliged to put on expert testimony in order to prevail. The other thing I have is, you know, I always go back to the basic concept of to whom does the—to whom does the defendant owe a duty to? And the duty in this case seems to run to the—to vulnerable populations. It runs to individuals who may be disabled or suffer from some condition of a sort that the plaintiff did. And it also, I think, runs to elderly patrons of the establishment, because these falls are nothing to fool around with. You can—an elderly individual falls and can break a hip or something and go to the hospital and never come out. And given that, the duty runs to these people. You need to take extra precautions in order to assure yourself that that duty has not been breached. And when you think of the fact that a fall may not be a problem with a 25-year-old, but it could be a problem with someone who has a disability or it could be a problem with someone in their 70s or 80s. And if the duty runs to those people, which it does, you've got to take extra precautions to make sure that that duty is not breached. And those precautions would be just a little signage or some cones or something. But they're vulnerable populations at the end of this road. That's my concern. I understand the court's concern. I would also say we would submit that medical expert testimony is required when there are multiple explanations for the mechanism of injury. And that's the issue in this case. Is there a condition that you think we should consider that is distinct from what the plaintiff testified to here? The three doctors are aligned on the question of there having to be some forced extension to get fixed inflection. Sorry, just please use plain English words. He's walking out of the store and blank happens. What is it that you're contending is an alternative explanation that blank happens? We contend that he trips. And then that then leads to the patellar pop. He trips for reasons that are unrelated to the slippery surface. He just coincidentally trips. So just let me make sure I understand. You agree that if he tripped, that there was sufficient medical testimony that that could cause the tendon rupture? That the trip is the cause. Yes. Okay. All right. So then tell me why the plaintiff's testimony that he slipped and then effectively tripped by putting his toe into the ground to catch himself is not the movement of a trip. Right. So your argument is if it was only a slip, if this was a cartoon slip, it wouldn't have happened. But we know this wasn't a cartoon slip. Right. This is a slip that led to jamming his toe into the ground, resulting in a pop. Right. And that sounds like a slip that results in a trip. Right. Why couldn't a jury conclude that even on your own theory, which for whatever good that is, even on your own theory, you agree there's enough evidence that if you jam your foot into something causing yourself to trip, that that would potentially shear it. It seems like that's what the plaintiff testified happened. That was not argued to the district court by the opponent. They argued that the slip happened and the slip led to the patellar tendon rupture. And there's no support for that medically whatsoever in the joint appendix by any expert who has to do that. So your argument is that they forfeited the argument that the plaintiff fell, as he described, that they forfeited their plaintiff's testimony. What their argument was to the district court was that the slip, as described by the plaintiff, is what happened. It is a slip, but it's not a cartoon slip. It's a slip that also involves jamming your toe into the pavement to try to catch yourself, resulting in a pop. It's a slip, as described by the plaintiff. It's not a slip on Bugs Bunny. We contend that wasn't raised to the district court, Your Honor. Would you agree if it was raised to the district court that the summary judgment has to be reversed? It makes it more complicated with the trip component, which is what's described, as well as the skiing accident mechanism. I don't see why you think that it seems to me you're working from a premise that in order to escape, in order to get before a jury that the plaintiff had to have some sort of expert medical testimony. And I'm just not certain that that is really correct. The circumstances seem to me, a lot of this case seems to me to be within the realm of common sense and sort of everyday happenings with which a jury would be familiar, irrespective of medical testimony. Jurors know what it's like. We're not talking about a very complicated product or a sophisticated piece of engineering or whatever. We're talking about people going in and out of a store and somebody cleaning a sidewalk or cleaning an area near the entryway. And jurors have that within their everyday experience. And whereas medical testimony might be very helpful, and the district court allowed your medical testimony in, that it still doesn't seem to me that you can come and say, well, because the plaintiff didn't put on medical testimony about this or that alternative explanation, that they are unable to go to trial. I just see that there's sort of an everyday, everyman component to this case, which swings free and clear of expert testimony. Your Honor, my time has expired. I'm happy to answer the court's question. Yeah, please, please. I also have a question. With respect to Your Honor's point, ordinarily slip and fall cases would fall into that bucket. But we're not dealing here with a broken arm or bruising or scratching. We're dealing with a complicated medical condition that now has multiple etiologies due to the patellar tendon rupture. And that tends to be the issue in the case, which is why we believe under Gambrell v. Burleson and under the litany of cases cited in the Lipitor matter that we cite, that expert testimony is required. All right. So I'd like to ask you about spoliation, and specifically whether the district court's explanation for why it denied sanctions was legally correct. So this is on JA-776. And the district court says the record does not support a finding of bad faith or willful misconduct and that Lewis has not presented evidence that Circle K acted with the intent to destroy evidence or hinder the litigation, citing an unpublished District of Maryland, I think maybe an unpublished decision of ours for that proposition. Is that not directly contrary to both Silvestri and Hodges, both of which I admit say that absent that finding, you can't get the, like, the hammer sanctions. You can't, like, enter judgment for the plaintiff. You can't strike the defenses. But I think we've made very clear you do not have to show that to get any sort of spoliation sanction, true or false. What those cases do say, Silvestri and Hodges, is that there has to be some intentionality, which we've submitted. Yes. You clearly intentionally repainted the lines. There's no question that that was on purpose. It was done by a vendor who was on a schedule. And the schedule, unfortunately, was uninterrupted. And the schedule is that – No, but – okay. But, again, we have made very clear you have to do something on purpose. But it is not the case the district court said – I mean, I'm just reading what the district court said. The district court said you have to show bad faith, willful misconduct, or intention to destroy evidence. And under our case law, you do not have to show those to get any sort of spoliation sanction. True or false? False because of the intention piece only. The intention piece, I think, is supported by Silvestri and Hodges. It has to be – But Hodges explains what the intent is. The intent is not to destroy evidence. Hodges specifically says you don't have to show intent to destroy evidence, right? Or – yes. But – or even do the very thing which is being called spoliation. But that's not what the district court said. The district court said no spoliation because you haven't shown bad faith or intent to destroy evidence. And that strikes me as just dead legally wrong. I think that it's supported still because of the intentional piece and the fact this was on a schedule, which is in the record that there were many stores going through this schedule. Thank you. Thank you, Your Honors. I'll try to be brief, obviously, and answer any questions the court has. I did want to just hit two different topics. Going back to Judge Wilkinson, what you talked about, the things that a store could do, signage and things of that sort. We have evidence, and I'm sure the court preaches the choir, that Circle K knew that. They knew that their employee was supposed to have a safety vest on. He did not. They knew that signs were supposed to go out when they did this type of work. It did not. The testimony was very clear that from Circle K's perspective and from their employee's perspective that Mr. Luce didn't do anything wrong. So this wasn't a situation where there was some kind of comparative. Can I ask you about the damages versus injury? Judge Heitens raises a good point that at least in theory the plaintiff could have damages for injuries other than the tendon. But when I read your briefing below, your opposition to the summary judgment, you don't seem to make that allegation. You seem to make the claim that the only injury that you're alleging or that you're defending summary judgment on is the knee, that you're not seeking damages for a cut on his butt or his scraped elbow or whatever it might be. Is that right based on the briefing below and sort of seems like based on the briefing here? I will say, Judge, that yes, the briefing below and here focus on the patellar tendon. I do believe, just in all candor to the court, that the patellar tendon is the main injury that we're seeking. But the main injury and the only injury might be different. And I think you could read the complaint more broadly. But I read your summary judgment briefing and your court of appeals briefing to sort of say that it is not just the main injury. It is the injury that is being sought here.  And that was more I do think it is, I guess, the injury, main injury. I can see the point of the court. But seeing the point. There is nothing in the record that has it other than the patellar tendon. Seeing the point is to say that you could have made different arguments. Sure. The point is what we've got here is that you've made one injury argument and the causation was about that one injury. And the existence in the complaint at a 12B6 doesn't help you at the Rule 56 stage. I don't think it does. Because the patellar tendon was what was done. It was part of what the summary judgment was. To that, though, I will say very briefly that the evidence, I believe I heard that there was no evidence that a slip could cause a patellar tendon injury. That's not true. Our doctor specifically said that, and I cited to it, that an unexpected slip could cause a patellar tendon rupture. Tell me, is this the compound question where you ask two things? Can it be caused by a slip or something else? I think it was the or, yes. It's a compound question. And so maybe we want to read that as answering the first part of the question. But he then, the next sentence talks about the ski binding, which really is the second part of the question, not the first part. That's true, Judge. And I will, even if you kind of throw that part out, he, as Judge Wilkinson is saying, South Carolina is very clear that if it's within the lay evidence or common understanding of someone, you don't need an expert testimony to tell you that. And so the common understanding of someone who slips and tries to plant and then hears a pop and then they find out that it's an acute patellar tendon injury, that in and of itself we believe would be enough to go in front of a jury. Do you think, so accept that for maybe just for half a minute. Yes. But even in that scenario, would you need evidence that it wasn't like a spontaneous rupture? I don't believe we would, Your Honor. I don't think we do have to have an expert. However, we do. No, no. I know that you do. I'm just saying as a general matter, right, that there is, you know, the defense puts on evidence that you can have a spontaneous rupture, particularly for someone who's had a rupture previously, and that that's not, at least within the lay opinion, be hard for me to like have a great sense of those two things, a spontaneous rupture, what that even like quite means. Now, maybe the testimony like excludes that, but do you think you need that testimony on the spontaneous piece, even if you don't need it with respect to the slip versus trip distinction to the extent it exists? If I'm understanding, and I'm way on my time. I think he'll let you answer it. If I'm understanding your question, do you need expert testimony regarding the spontaneous? I think you do. Yeah. Because that is not something within, I frankly never heard of a spontaneous patellar tendon rupture until I got into this case. And so, yes, I do believe that the spontaneous, just like a spontaneous whatever, would be within the realm of something that an expert would have to come in and say how that could even happen. Thank you, Your Honor. We would ask that you reverse. Thank you. Do you have anything further? No. All right. We appreciate both your arguments, and we'll come down and greet counsel, and then we'll move right into our next case.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Toby J. Heytens